TRAMMEL AND ANOTHER, ADMINISTRATORS, ETC., v. T. L. PHIL-
LEO, ADMINISTRATOR, ETC.

1. During the rebellion an administrator obtained orders of the probate court
to sell assets " for cash," and under such orders he made sales for Con-
federate notes, which he paid to such creditors of the estate as would
accept them. After the close of the rebellion the probate court per-
mitted him to resign his letters of administration, and to settle his ac-
counts on Confederate money returns and vouchers. *Held*, that the
orders and judgments of the probate court, approving such accounts
and discharging the administrator, are not merely erroneous, but are
null and void, and must be so held in all collateral as well as direct pro
ceedings wherein their validity becomes a question. *Held, further*, that
the administrator must be charged with the value of the assets at the
time he sold them for Confederate notes ; that such creditors as received
from the administrator full payment in such notes shall not be allowed
to revive their claims against the estate ; and, the estate being insol-
vent, the *pro rata* dividends to which such creditors would, if paid in
legal currency, be entitled, are to be allowed to the administrator as
credits. And *further held*, that the administrator's commissions are to
be computed upon the like lawful money basis, and he is not to be al-
lowed commissions upon his commissions.

2. Attorney's fees, reasonable in amount and shown to have been necessarily
incurred in the administration of the estate, are allowable to an ad-
ministrator ; but liberal commissions should not be allowed to an admin-
istrator, and attorneys be also paid out of the estate for conducting the
administrator's business.

3. The administrator and the sureties upon his bond are liable to the credi-
tors of the estate for the settlement of his trust in accordance with the
directions here given.

APPEAL from Rusk. Tried below before the Hon. J. B. Wil-
liamson.

John Robertson died in the year 1863, and Philleo, the ap-
pellee, was appointed administrator of his estate.

The appellants were creditors of the estate, but did not present
their claim to the administrator, duly probated, within one year
from the issuance of the letters of administration.

The record is voluminous and full of matters of account, but it is not necessary to state them in detail. The opinion of the court states clearly the most material facts. The appellants filed exceptions in the probate court to the final account and report of the administrator, but that court approved the account and settlement, and the appellants took the case by appeal to the district court, where the case also resulted against them, and they therefore appealed to this court.

*Martin Casey* and *W. W. Morris*, for the appellants.—Article 1344, Paschal's Digest, prescribes the order of payment when the administrator has funds in his hands, but not enough to pay all the debts, or when the estate is insolvent. First, claims having a preference, which must be paid in full, " and then to the payment *pro rata* of the other claims allowed and approved, or established; taking into consideration, also, the claims that were presented within the twelve months, and in suit, or on which suit may yet be instituted." Perhaps it will be contended by the appellee, that the appellant's claim, though presented within the twelve months, not having been approved within that time, is not entitled to a *pro rata* share, the estate becoming insolvent by reason of the effects of the war. It appears by comparing this article with Article 1339, Paschal's Digest, which provides for payments: first, " funeral expenses and expenses of last sickness; second, all expenses of administration * * *; third, debts secured by mortgage or lien; * * * fourth, all other debts * * *. When there is a deficiency of assets, debts of the fourth class shall be paid *pro rata*; and no executor or administrator shall be allowed to pay any claims of the fourth class, whether the estate is solvent or insolvent, except with their *pro rata* amount of the funds of the estate that have come to hand." Both these articles are part of the same act of 1848, and must receive that construction which will give force and effect to each provision, and not such construc-

tion as will make one contradict and partly repeal the other. Both will harmonize by reading the last clause of Article 1344 thus: "Taking into consideration, also, the claims that were presented within the twelve months, and the claims that are in suit, or on which suit may yet be instituted." In violation of both these articles, the administrator paid a large amount of claims ia full, and refused to pay George W. Trammell anything, because he refused to take Confederate treasury notes.    He was under no moral, equitable, or legal obligation to take anything in payment of his claim, except gold or silver, for no other medium was then a legal tender.    The administrator should be held responsible for the excess of the debts he paid in full over their *pro rata* share.

In Lockhart v. White, 18 Tex. R., 102, the Supreme Court, on page 108, refers to Article 1187, Hartley's Dig., (which is Art. 1338, Paschal's Dig.,) as prescribing the order in which debts shall be paid.    The court say: "The appellant insists that under Article 1192, (which is Art. 1344, Paschal's Dig.,) the mode of payment of debts of an estate is prescribed, and payment without an order of the court makes the administrator responsible for all the debts.    This view of the law is believed to be unsound. The Article 1187 declares the order in which debts shall be paid; and by Article 1189, the administrator, when he shall have funds of the estate, is required to pay."    The court in the same case, page 108, shows the liability of an administrator who pays some claims wholly and pays nothing on others.    The court say: "And if the payment be not in due order, that is, if payment be made to one or more creditors of a portion or the whole of their claims, (as is charged to be the case here,) and no such payment is made on other claims of the same class or degree, this would not render the administrator liable for the debts unpaid out of his own property.    The county court might refuse to allow such payment in the account of the administrator, and make him liable to the extent of the assets thus misapplied."    This is what was asked by the ap-

pellants, and refused by both the courts below, and so the sixth assigment is well taken.

There is no provision in our statute by which an executor or administrator can sell property otherwise than for cash or on credit, and the law gives the county court no power to direct sales of decedent's property, to be paid for in any other manner, or by any other means, than in cash ultimately. (See Arts. 1321 and 1322, Paschal's Dig.) The exception mentioned in the latter article is in relation to sale for cash, or on credit, "when the sales are ordered to raise the amount of the allowance that may be made under the provisions of the forty-fourth and forty-fifth sections of this act, or for the satisfaction of a mortgage or lien on said land or slaves, in which cases such sales shall be made on such terms as the chief justice may direct." That is, such sales may be for cash, or on credit, or partly cash and partly credit, because the same article prescribes that "sales of personal property, other than slaves, for the payment of debts, may be ordered for cash, or on credit, and all sales of land or slaves, for the payment of debts, shall be made on a credit of twelve months."

Should the county court order a sale of property for the promissory note of an insolvent, or an alien enemy, that order would be a nullity, because the law provides what the consideration shall be. Such order may be collaterally attacked for want of power in the court, and so, for want of jurisdiction; and the purchaser, under such order, could obtain no title to the property sold.

Withers v. Patterson, 27 Tex. R., 493, was a suit in trespass to try title. The land sued for by the surviving wife and children of Withers had been purchased at administrator's sale. On the trial, it appeared that the administration had been closed before the appointment of Jones as administrator. Jones applied for and obtained an order of the probate court that all the real estate of Harrison be sold, because "some small debts have been made against the estate for fees of office," etc. Judge Bell, delivering

the opinion of the Supreme Court, says, page 495: "The juris-
diction of a court means the power or authority which is conferred
upon a court, by the Constitution and laws, to hear and determine
causes between parties, and to carry its judgments into effect.    It
is a plain proposition that a court has no power to do anything
which is not authorized by law.    The powers of county courts, in
respect to the estates of decedents, are all conferred by statute.
Whatever the statute authorizes the court to do, it may rightfully
do, but it does not follow, because the statute authorizes the court
to order the sale of land under certain circumstances, that all sales
of land by order of the court are authorized."    And on page 497
and 498, he says: "Orders or judgments which the court has not
the power, under any circumstances, to make or render, are of
course null, and being null, their nullity may be asserted in any
collateral proceeding where they are relied on in support of a
claim of right."    There is one instance in which the administra-
tor may take property or claims for debts due to the estate he ad-
ministers.    The provision is found in Art. 1337, Paschal's Digest.

Trammell v. Swan, administrator, 25 Texas R., 473, was a suit
on a note made to a former administrator, Legrand.    The defen-
dants plead, by way of payment, the receipts of Legrand for sev-
eral claims placed in his hands by the defendants, and in those
receipts he agreed that the amount of the claims should be pay-
ments on the note of the defendants.    The Supreme Court decided
in that case that Legrand, as administrator, was not bound by his re-
ceipts, because he had not first obtained the order of the chief jus-
tice so to do.    And so the first assignment is well taken.

The appellee will probably insist in this court, as stated in his
answer in the courts below, that all his accounts of sale were
approved and confirmed by the county court, without any objection
or opposition from the creditors of Robertson's estate, and so the
approval of his administrative acts is conclusive on the creditors.

This position is not tenable.    In Ingram v. Rogers, 6 Tex. R.,

130, it was decided that no order of the court was final until after final settlement. If the position be correct, the right of appeal from any order of the county court would be a nullity, a mockery.

Paschal's Digest, Art. 1382, provides that "any one interested in the estate of a deceased person, may, at any time within two years after the settlement by the chief justice, of any account of the executor or administrator of such estate, have the same revised and corrected by the district court of the county where letters were granted," upon filing a transcript. There can be no difference in principle between that mode and by appeal. Birdwell v. Kauffman, 25 Tex. R., 189, decides that any and all accounts of an executor or administrator, as well as his final account, may be revised in two years.

The administrator may have benefited the estate as stated by him by prudence and sagacity; but that is not the whole duty of an administrator. He ought to be just to the creditors, and be a benefit to them by strictly following the law. He ought not to prefer one set of creditors by paying them all their debts, and pay G. W. Trammell nothing because he refused a worthless currency.

He ought to be content with his commissions in the currency for which he sold the property of the estate, and above all he ought not to charge commission on commission, for money he retained. The commission authorized by law is five per cent. on all cash received and paid out. If the commissions which he retained on the Confederate money in specie were estimated at the relative value of specie and the other currency, no doubt, it would appear that instead of receiving five per cent. he actually received and retained one hundred per cent. Is it possible that the appellants are entitled to nothing, and have no remedy under the facts in this case, and the acts of the administrator T. L. Philleo?

That Philleo by selling the property of the estate in direct violation of the orders of the county court directing its sale for cash, acted in his own wrong, and cannot be heard to gainsay the con-

sequences of the act. The plaintiffs in error ought not to be prejudiced because their intestate refused, for an acknowledged debt, payment in illegal and worthless currency. The defendant in error invokes history to demonstrate the danger of impending war (of which there is no proof) to the protection of private property. The same history proves that no hostile forces occupied the country in which the property in question was situated. The same history informs us that a large amount of individual cotton was held until after the war, and sold for gold.

Had the defendant in error (not being able to sell the cotton for cash) held it until lost by the casualties of war, such fact would have afforded him ample protection. Having assumed the responsibility of a different and illegal course, fixes his liability to the creditors, of whom he was the trustee, and the orders of the county court confirming the sales afford him no relief because of their illegality.

The manumission of the slaves belonging to the estate affords no ground of defense. The emancipation proclamation of President Lincoln of January, 1863, warned the defendant in error of the practical freedom of the slaves that followed. He should have looked to this in his official progress.

Having retained his commissions in specie on payment to creditors which he alleges counted dollar for dollar, he thereby for his own individual profit treated the whole fund as specie, and is estopped from denying it, as a protection against his illegal acts. Looking to the enormous prices paid in Confederate money, for articles charged in his acounts, which he rates as specie in the charge of commissions, the injustice is glaring.

*Parsons & Jones*, for the appellee, directed their attention principally to the facts of the case.

*Bonner & Bonner*, on the same side, discussed minor questions, and submitted the following argument upon the leading

XXXIII—26

ones: Without calling to our aid, in the first place, the approval
by the court of the sales, we submit that under the circumstances
surrounding this case, in view of the condition of the country,
and the *de facto* legislation which governed both the courts and
individuals at the time, the sales in Confederate money were not
only proper, but almost if not entirely compulsory, though they
in the end proved to be to the best interest of all concerned. It
will be recollected by the Supreme Court that at that time, 1863,
and the early part of 1864, the unhappy contest between the
the North and the South was at its height. By express legisla-
tion both of the State and the Confederate governments, Con-
federate money was not only recognized, but forced into circula-
tion as the currency of the country, and also by the threats of
confiscation, and by the orders of military commanders who had
large armies at their control to enforce their orders. In the lan-
guage of Chief Justice Chase, in the late case of the Petersburg
Railroad Company, "This currency may fairly be said to have
been imposed on the country by irresistible force. There was no
other in which the daily current transactions of business could be
carried on, and there could be no other while the rebel govern-
ment kept control of the rebel States. The necessity to use this
currency was almost the same as the necessity to live. No pro-
test, no resistance, no rejection could avail anything." It is a fact
well known that there was no other currency in circulation in the
country, and hence sales could not have been made in gold or
silver.

Again, it is a historical fact that during this time there was no
security for personal property, such as was sold by the adminis-
trator, even when parties owning the same were living and permit-
ted to remain at home with it. The cotton, for instance, sold for
$8821 75. Had it not been sold by the administrator, the govern-
ment would in all probability have obtained one-half of it, and the
other would have been subject to waste, damage and pillage, as

would also have been the case with the other articles of personal property. In those days men had no certain rights of person or property.

Again, if the property had been sold even injudiciously, (and not as was the case here, for a very exorbitant price, and the proceeds made to avail the estate dollar for dollar,) then, under the circumstances of this case, there being still left a large amount of property (the negroes) on hand, and much more than enough to pay all the claims against the estate, the subsequent emancipation of these negroes by the *vis major* will be treated as an accident for which equity would relieve the administrator. (See 1 Story Eq. Jur., § 93, p. 111, and authorities there cited.) And in accordance with this sound, just and salutory principle of equity, our State Convention for 1866, ordinance No. 11, section four, declares " that in all cases where executors, administrators, trustees, agents or bailees have received and paid out Confederate money or State currency, the courts in the settlement of their accounts shall be governed by principles of justice and equity as well for the protection of the rights of heirs and creditors as of such executors, administrators, agents and bailees." It is believed that this ordinance in no wise whatever is violative of the Constitution of the United States or any law of Congress, and commends itself as a wise and beneficent rule for the settlement of those rights and vexed questions which might for years to come be a prolific source of troublesome and vexatious litigation.

III. The third proposition submitted for the consideration of the court is that previous orders of the county court, approving the reports of sale and the exhibits of the administrator showing the payment of the claims against the estate, cannot be collaterally impeached. " Orders or judgments of a county court made or rendered in the progress of a rightful administration concerning matters upon which the court had the right to deliberate and decide, cannot be collaterally impeached, because however erroneous they

may be they are not void." (27 Texas Rep., p 492, Withers v. Patterson.) See. also note 485, Paschal's Digest, p. 314; where the authorities on this and other points in this case are collected, and it is decided in 22 Texas Rep., 304, Wells v. Mills, that the power of confirming sales made by an administrator of property of an estate, vested in the chief justice, carries with it the exercise of a sound discretion; and when discretion is so confided there can be no revision and no appeal. See also 4 Texas Rep., 223, Davis v. Stewart; and 16 Texas Rep., p. 377, Yerby v. Hill, also note 498, Paschal's Digest, p. 322. And hence so far as the orders of the county court confirming the two reports of sale are concerned, they could not be revised, even in a direct proceeding, but are conclusive. One if not both of these reports of sale, as will be seen from the transcript, if properly made out, shows on its face that the sale was made in Confederate money, and both were formally approved by the county court, with the full knowledge and understanding that the same were so made in Confederate money. The alleged error then that in making the sales in Confederate money, the administrator disregarded the order of the court, is not true in fact, but admitting that he had disregarded the same in a technical sense, yet the subsequent order of the court approving the sales in Confederate money, gave to those sales, in substance and legal effect the same validity as if made under the express order of the court; and what was of equal if not greater effcacy, the parties interested who were entitled to the money and who had the right to control the same, did receive this Confederate money in full of their claims, as though the same had been gold or silver, and their evidences of indebtedness duly probated against the estate were given up to the administrator, and filed in this case by him as vouchers in his exhibit and report, filed March 28, 1864, and his action in the premises approved by the court. This is a very different case from that of Hamilton v.

Pleasants, error from De Witt county, lately decided by the present Supreme Court.

No order of the county court was required to justify the administrator to pay the probated claims. (See 18 Texas Rep., 102, Lockhart v. White).

In this connection, we submit that so far as the first account of the administrator, for expenses incurred in carrying on the farm, etc., for $5736 52, vouchers 46 and 47, is concerned, and which was embraced in administrator's report filed twenty-eighth of March, 1864, and approved by order of the County Court of Rusk county, the same thereby becomes a valid and subsisting judgment and probated claim against the estate, and could not afterwards, by attacking the administrator's report for final settlement or otherwise, be collaterally impeached. Having become a probated claim against the estate, it could only be set aside by a direct proceeding having that object in view.

This is decided expressly in the case of Davenport v. Lawrence, 19 Tex. R., 317. The court there say: "It will be perceived that such necessary expenses of administration and extra compensation are acted upon by the chief justice as any other claim against the estate and necessarily involves an act of judgment founded on facts, in evidence before him or within his own knowledge, so as to supersede the necessity of proof. By his approval they become liabilities against the estate, and may be attacked just as any others which have been approved by the chief justice." "To permit every creditor to contest every order of the chief justice, upon every application for the distribution of the funds, would involve the administration and the court in a complication of difficulties interminable, and could hardly have been contemplated by our statute." (See pp. 319 and 320 of 19 Tex. Reps., Davenport v. Lawrence.)

To set aside a claim which has been regularly probated against an estate, (including approved accounts of administrators,) requires

a direct original proceeding for that purpose, in the district court
The same cannot be questioned at a subsequent term of the county
court. (See 22 Tex. Reps., Heffner v. Brauder,) which also says
that the judgment of the county court would not be set aside as
a matter of course, but only on the fullest proof. (See also, 5
Tex. Reps., Neill v. Hodge, and 17 Tex., 7 Pitner v. Flanagan.)

WALKER, J.—On the thirtieth day of January, A. D. 1866,
George W. Trammel, by his attorney, filed his petition in the
County Court of Rusk county, in the words and figures following :

" *To the Honorable Chief Justice :*

" Estate of John Robertson.—Your petitioner, George W. Tram-
mel, says that he holds a probated claim against the said estate of
John Robertson, which is now a legal demand against said estate.
That T. L. Philleo, the administrator of said estate, has funds in
his hands arising from the sale of property belonging to ‘ said
estate, in specie, the sum of thirty-five hundred and fifty dollars
and twenty-six cents; that the amount of the claim petitioner
holds against said estate is a note for twenty-eight hundred and
fifty-six dollars, with interest at twelve per cent. per annum from
the eleventh of March, 1861. Your petitioner prays that said
Philleo be ordered to pay over to your petitioner such amount of
said money as may be due him. Your petitioner says that said
Philleo has sold a large amount of property belonging to said
estate, and has paid a large amount of debts due from said estate,
in full, when in fact said estate has proven insolvent. Wherefore,
said petitioner claims that he is entitled to his *pro rata* share of
the value of said property with the other creditors.

" GEORGE W. TRAMMEL,

" By his attorney."

Letters of administration upon the estate of Robertson were
granted to Philleo on the fourteenth of March, A. D. 1863. The
note to George W. Trammel fell due on the first of April, A. D.

1862, was accepted for payment December 18, 1863, and approved by the chief justice November 9, 1865.

On the thirtieth of April, 1866, the appellee filed his final account with the county court, praying that the same be allowed and approved, and that he be permitted to resign his trust.

In the meantime the death of George W. Trammel was suggested on the record, and his administrators were made parties. The accounts and vouchers of Philleo were accepted and approved; his resignation accepted, and L. J. Graham appointed administrator *de bonis non*.

Trammel and Stroud appealed to the District Court of Rusk county, in which court the case was subsequently tried by the court, neither party claiming a jury. The judgment of the county court was in all things approved and affirmed, from which judgment of the district court appeal is taken to this court.

Five causes are assigned for error, which are as follows:

First—There has been no order of the county court authorizing the administrator to sell any part of said estate for Confederate money—and so the administrator ought to be charged with such notes in par funds, or with the value of the property in par funds. There was no order of this court authorizing the administrator to hire any part of said estate for Confederate notes, and so the administrator should be charged with the value of hiring in par funds.

Second—The item of $5763 52, T. L. Philleo's account, is too indefinite, stating no particulars; strict proof is demanded of the items of the account.

Third—Excepts to items of commission for receiving and paying out $1025 37, and item $1229 74. These items are charged as specie on Confederate money received and paid out, whilst his report shows Confederate notes enough to pay himself for said commission.

Fourth—Exceptions are taken to his having paid out some claims in full, whilst nothing has been paid on others.

Fifth—There is nothing in said report showing definitely the expenses and income of the plantation, slaves, teams, etc., and they pray for a full, clear and definite statement of all such matters and things. Exception is taken to the allowance of attorney's fees, unless the same be shown to be necessary and proper.

A full examination of these exceptions by the record and upon authorities has involved the court in much labor.

John Robertson, deceased, left a large estate in lands and personal property, including slaves, teams, domesticated animals, cotton, and implements of husbandry. His estate was largely in debt, but was undoubtedly solvent, if the administration had been conducted in strict accordance with law.

He owned about thirty slaves at and after the issuing of the emancipation proclamation by President Lincoln. The slaves were still held as property, and were sold as such in the State of Texas as late as the early part of the year 1865. The proclamation was a war measure, which was not carried out practically in the State of Texas until the summer of 1865; but this administrator, exercising the ordinary judgment of an intelligent being, took upon himself too great a risk in withholding this species of property from sale for the payment of debts, regardless of the imminent rick of the President's proclamation being made good vi et armis. But we are not called upon in this case to decide whether or not, by so doing, he has incurred a liability to the creditors of John Robertson.

It further appears from the record that the administrator Philleo undertook to carry on, and did carry on, Robertson's plantation during the years 1863-4-5, until the negroes were practically emancipated, thereby incurring large expenses, and returning comparatively small profits to the estate of Robertson. From time to time, as he had cotton on hand for sale, by representing it as per-

ishable property to the county court, he obtained orders to sell, and did sell it. In every instance he is ordered to sell for cash. Considering these orders authority to sell for Confederate notes, he did so, except, perhaps, the last sale which he made.

He made due returns of his sales, and they were approved and confirmed by the county court.

It appears by his account current that he paid out about $25,000 in Confederate money to the creditors of the estate, and as expenses in carrying on the plantation; and it is in evidence that he offered to pay the appellants or their intestate in Confederate money, which they as well as others of the creditors refused to accept.

It appears from the record that at the time of his final settlement, he had on hand in specie upwards of $3000.

His commissions are charged upon Confederate money, received and paid out, and are paid in specie; he has also charged a commission on his commission.

By the admissions of his counsel in their brief, the property which he sold brought four times as much in Confederate money, as it would have brought in specie or par funds.

It is therefore virtually admitted that had the property been sold according to law, and paid for in anything which could be termed cash, his commission must have been less by three-fourths of the whole amount which he has charged and received. The court cannot refrain from remarking that ordinary liberality would have directed the payment of his commission in kind with that which he gave to the creditors.

The administrator Philleo arrogates to himself much merit for having realized the large sums which he did in Confederate money; but neither they who accepted it in payment of their debts nor those who refused to accept it will accord him the merit of a benefactor.

The appellants not having their claim presented within one

year from the granting of letters of administration, it is claimed that they should not be allowed to maintain this suit without showing that there were assets in the hands of the administrator, more than sufficient to pay all preferred claims.    (See Paschal's Digest, Art. 1307.)    Had this defense been relied on, it should have been distinctly set up by the appellee ; and by all the rules of evidence the *onus probandi* would then rest upon him.

But the essential question raised by the exception relieves us of the necessity of giving this objection any further notice.

The appellee claims protection under the orders of the county court, and insists that if those orders were even erroneous they cannot be impeached in this proceeding.

We have carefully examined the well considered and able opinion of this court delivered by Mr. Justice Bell in the case of Withers v. Patterson, reported in 27 Texas, p 491.    The court say, " orders and judgments which the court has not the power under any circumstances to make or order are of course null, and being null their nullity may be asserted in any collateral proceeding where they are relied on in  support of a claim of right." (See also the case of Birdwell v. Kauffman, 25 Texas, p. 189.) We are clearly of the opinion that if the county court had ordered the appellee to sell the assets of Robertson's estate for Confederate money, all such orders would have been  null and void, and might be collaterally impeached in this proceeding.

We are therefore of the opinion that there is manifest error in the proceedings of the court below, as set forth in each of the five exceptions taken thereto.

The appellee must therefore be charged with the par value of the estate of John Robertson at the time when he sold them ; and as to such debts as he claims to have paid in full, he may himself become a creditor to the estate to the extent of the *pro rata* dividend of each of such creditors, if paid in par funds.    It is not the intention of the court herein to pronounce the opinion that such credi-

tors as received Confederate money willingly in discharge of their debts will be allowed to revive their claims against the estate of Robertson. We have repeatedly decided that parties so situated are *in pari delicto*, and are not entitled to relief under the law.

The administrator will be entitled to commission only upon the amount received and paid out in par funds, and should not be allowed to charge commission on his commission. Attorneys' fees will be allowed to a reasonable amount, where it is made to appear to the satisfaction of the county court that their services were necessary in the administration.

It is not the policy of the law that liberal commissions should be allowed to executors and administrators for settling the estates of deceased persons, and at the same time attorneys be paid for doing the business.

The appellee and the sureties upon his official bond will be liable to the creditors of Robertson's estate for a correct administration under the law as set forth in this opinion.

The judgment of the district court is reversed, and the cause remanded for further proceedings in conformity with this opinion.

Reversed and remanded.