WM. R. ROBERTS V. J. J. TERRELL, COMMISSIONER OF THE GENERAL LAND OFFICE.

No. 1832. Decided May 20, 1908.

**Public Land—Islands—Location and Patent.**

Reviewing the legislation of the Republic and State of Texas with reference to the disposition of its islands, it is held that they were not subject to the location of land certificates, but set apart to be specifically dealt with, and the right given by the Special Act of March 30, 1889, granting a land certificate to W. A. A. Wallace and authorizing its location upon any of the vacant public lands of the State "either within or without the several reservations heretofore created by law" did not legalize the location of same upon an island belonging to the State. (Pp. 578–582.)

Original proceeding in the Supreme Court by Roberts, to obtain a writ of mandamus against the Commissioner of the General Land Office.

*Gregory, Batts & Brooks,* for relator.—The law, as same existed on August 2, 1892, did not permit the location of land certificates on the tide-water islands of Texas; and the alleged location of the Wallace land certificate under which respondents, other than the respondent Terrell, claim title to the land in controversy was and is for that reason void. State v. Delesdenier, 7 Texas, 76; Tabor v. Commissioner, 29 Texas, 508; Franklin v. Tiernan, 56 Texas, 618; Day Land & Cattle Co. v. State, 68 Texas, 526; Hunter v. Howard, 10 S. & R. (Pa.), 243; Shrunk v. Schuylkill Nav. Co., 14 S. & R. (Pa.), 70; Johns v. Davidson, 16 Pa. St., 512; Stover v. Jack, 60 Pa. St., 339; Fisher v. Haldeman, 20 How. (U. S.), 186; Fisher v. Carter, 1 Wall. Jr., 69.

*James & Yeiser,* for respondents, Munson and others claiming under the Wallace location.

The act under which the Wallace certificate was issued is as broad as it could have possibly been made, as it authorizes the holder of the certificate to locate same upon any of the vacant public lands in the State either within or without the several reservations heretofore created by law. We might strike out entirely the last clause of this act and it would still have authorized William A. A. Wallace to locate his certificate upon any of the vacant public land of the State, which would include all vacant public land on any of the islands along the coast, but in order that there might be no misunderstanding or misapprehension the Legislature went further and authorized the location of this certificate upon any vacant public land even though the same might be within any of the reservations then known to the law. It is certainly well known that every lawyer and even laymen in Texas regarded the islands along the coast as a reservation and the Legislature so regarded them and intended by the passage of this special act to authorize Bigfoot Wallace to locate a certificate upon any vacant public land no matter where he might find it.

The court's attention is further called to the fact that there were five other locations made by virtue of this special act, three of them being upon vacant land, upon Galveston Island and two upon vacant land on Harbor Island and all five of these locations were patented by the State of Texas, and no question has ever been raised by the State as to the validity of these patents, nor has the State ever sought to disturb the various claimants now holding under those patents.

Mr. Justice Williams delivered the opinion of the court.

Having done everything required by the Act of April 24, 1907, (Laws 30th Leg., p. 320) to entitle himself to a patent to a tract of land on Mustang Island and the issuance thereof having been refused by the respondent, relator applies for a mandamus to enforce performance of the duty.  Respondent bases his refusal upon the existence of an older claim to the land asserted by co-respondents, Munson and others, under the location of a certificate made ·in 1892, and the only question in the case is whether or not such a location upon an island is valid.

The certificate was granted to William A. A. Wallace by special Act of the Legislature of date March 30, 1889.  Besides granting the certificate the Act provided: "The said certificate may be located upon any of the vacant public lands of the State, either within or without the several reservations heretofore created by law."  It also recited, as the emergency which called for its immediate passage, the facts that Wallace had rendered great service to the State and was in necessitous circumstances.

The contention of corespondents is that lands upon islands come within the language of the statute and were made subject to location as being vacant public land within a reservation.  On the other side it is contended that more express and specific authority for such a location is necessary to overcome the effect of other laws and the long settled policy of the State withholding islands from location and looking to the disposition of them in another way.  There can be no question of the existence of the other laws and of such a policy.  They seem to have originated with the joint resolution of the Congress of the Republic of December 10, 1836, which authorized the President to raise money upon loans and upon sales of land script to be satisfied out of the public land, but which declared that: "All islands belonging to this Republic are hereby reserved for government use, except the President be authorized specially by Congress to sell them."  Further expression was given in subsequent laws.  On the 8th day of June, 1837, the Congress passed an act for the relief of James Erwin and others which, also, authorized the issuance of land script, and which provided: "That no lands granted by this government shall be located on salt springs, gold, silver or lead, or other minerals, or any island of the Republic."  The Act of January 20, 1840, adopting the Common Law, excepted out of the repealed laws in force under the former governments and continued in force those reserving mines, islands, etc.  Of this provision this court remarked in The State v. Delesdenier, 7 Texas,

107: "And, although no such laws were known to exist, the exception indicates the belief of the Congress that islands at that time were not subject to location, and its intention to continue such laws in force." On the 17th day of June, 1837, an act was passed providing for the surveying of the islands into small parcels and for the sale thereof at public auction. It is a part of the history of the State that such surveys and sales were made upon Galveston Island, and also that from time to time locations of land script were made upon the public lands on the islands. In 1848 the Legislature adopted a joint resolution directing the Attorney-General to investigate the condition of the claim of the State to the various islands and, if necessary, to institute legal proceedings, etc. Under this authority the suit of The State v. Delesdenier, supra, was instituted and resulted in a decision by this court that locations of land script upon the islands were illegal and void. This was followed by a like holding in Franklin v. Kesler, 25 Texas, 138. Some statutes were afterwards passed for the relief of some of the persons claiming under such locations (Pasch. Dig., 4251, 4253), but the rule as to their invalidity has never been changed or shaken.

From the case of Tabor v. Commissioner, 29 Texas, 508, further legislation will appear for the sale of the islands, along · with alternate sections located for the State under railroad certificates. In 1870 a law was passed authorizing homestead settlements upon "any part of the public domain," and, apparently, it was thought by some that this authorized the appropriation of land upon islands. (Franklin v. Tiernan, 56 Texas, 618). This position was never brought to the test of a definite decision of this court, because of the passage of the amendatory act of 1871, which excepted out of the broad provision stated lands included in "any railroad reservation," "State sections surveyed by virtue of a railroad land certificate," and "islands," and which validated settlements made under the act of 1870. It was therefore found unnecessary for this court, in Franklin v. Tiernan, supra, to decide the question whether or not the language quoted from the act of 1870 authorized the appropriation of lands upon islands by claimants of homestead donations, the claim in question in that case having been validated by the act of 1871.

The several laws and resolutions stated as affecting the question were not carried into the revision of the statutes of 1879, but by the act of the Legislature adopting the statutes, as revised, the repeal declared of pre-existing laws was restricted to "statutes of a general nature," and it was expressly declared that: "No law in reference to land reservations, or setting apart portions of such reservations for the benefit of actual settlers, or for the construction or repairing of public buildings of the State shall be affected or impaired by the repealing clause of this title, unless expressly altered or repealed by some of the preceding articles of the Revised Statutes." (Rev. Stats., Final Title, secs. 4 and 13). Whether for the reason that they are not within the repealing sec-

tion, or that they are within the saving provision, it is clear that the rules previously established concerning islands, in force when the revision took place, were still in force when the certificate was granted to and the survey was made for Wallace.

Of the effect of the provisions of the laws of the Republic, these observations were made in State v. Delesdenier, supra:

"By the acts and resolutions above cited the intention of the Government is clearly shown to reserve all islands from location. The public domain was the principal source of revenue possessed by the Government. Upon that, as a pledge, she had borrowed large sums of money, especially reserving the islands for her own use, either because they were more valuable or more available than other portions of the public domain.

"Congress, having declared that the islands should not be sold unless express authority was given for that purpose, at a subsequent day directed a sale of them in a particular way. The manner in which the sale was to be made was such as to derive the greatest possible amount of revenue from the islands. The islands, as well as other portions of the public domain, were rendered available to meet the exigencies of the Government." . . .

"The island of Galveston having been reserved from location and sale, unless special authority for that purpose was given by Congress, was, from that moment, severed from the public domain; no general repealing clause contained in subsequent laws can be held to apply to the act appropriating it to a particular purpose.

"Having lost the character of "public lands" it could not regain that character except by direct and express terms. We are therefore of opinion that the court erred in permitting the patent of Jones and Hall to be read in evidence; the patent being for lands not subject to appropriation by individuals by location, is absolutely null and void."

It was hardly accurate, we think, to say so broadly that the islands were "severed from the public domain" and that they "lost the character of public lands." This is true, we think, only in the sense and to the extent intended by the court in deciding the question before it, which was whether the lands were open to location by persons holding claims to be satisfied by selection and appropriation out of the public domain generally. The fact that they had been declared to be not subject to such locations was sufficient for that case. The islands certainly continued to be a part of the public domain and to be public lands, but not such public lands as were open for other dispositions than that provided for. The remark made by Judge Roberts in Galveston v. Menard, 23 Texas, 395, while casually stating this legislation, is more accurate, viz: "By this it was manifested that special control over the island was assumed by the Government."

Undoubtedly the effect of the legislation was to set apart the islands to be specially dealt with in a way differing from the course prescribed for the appropriation of the great mass of the public domain. While the purpose of this may have been temporary originally, it has never been changed and the islands have been

kept separate, in our legislation, from the lands of the Republic and State which were devoted generally to the satisfaction of claims of individuals and other purposes of government. This consideration is important in the construction of laws providing for the location of land designated generally as public domain or vacant public land or by other like designation. Having once specifically reserved, or set apart, or withdrawn certain lands from such appropriation, it is not to be supposed that by subsequent general legislation the Legislature intended to authorize the appropriation of them unless such intention is clearly expressed; and it has, therefore, been held in a great number of cases, in this State and elsewhere, that general laws authorizing locations or entries upon and surveys of public lands, or public domain, or vacant lands do not apply to lands that have previously been so appropriated, reserved, set aside, or withdrawn. Gammage v. Powell, 61 Texas, 629; Day Land & Cattle Co. v. State, 68 Texas, 526; 26 Am. & Eng. Ency. Law, 222, 224.

The operation of this rule of construction would have been to exclude the location of Wallace's certificate upon any reserved land but for the express language of the statute that it may be "located upon any of the vacant public lands of the State within or without the several reservations heretofore created by law." The question is whether or not this was intended to permit such location to be made upon islands. The difficulty of giving a negative answer arises alone from the fact that islands may be said to have been reserved, and the further fact that the statute makes no express distinction between different classes of reservations. When the nature of the provisions is considered and the language of the permission is closely examined, in the light of the reason upon which the rule of construction already stated is based, the difficulty disappears. That which is granted is a land certificate, evidence of a right to acquire public land such as had always been satisfied out of lands used for locations and surveys, of which lands islands have never been a part. This right was granted to be exercised by a *location,* and locations have always been required to be made upon lands other than islands. The lands declared subject to the location of the certificate are further described as *vacant public land,* a style of phrasing generally used, interchangeably with others, to indicate lands devoted to location or settlement. The term, vacant, in the sense of being open to appropriation by those holding claims for lands, would not apply to lands occupying the legal status of islands under our law, nor to much other land reserved and set apart for specific purposes, such as the building of the Capitol. The significance of all this is that it reveals the thought in the minds of the Legislature in passing the Act in question. When granting a land certificate, to be located, upon vacant land, those minds would naturally, almost certainly, be directed to lands of the kind which had been and were to be employed for such purposes, and not to islands which, by laws applying to them apart from all other lands, were entirely removed from the reach of holders of certificates or other claims against the public

domain.   This seems to us to be the true and sound reason for the rule of construction to which we have referred.   In legislating about the location of certificates upon vacant land the Legislature is not to be supposed to have had in view lands never used in that way.

But lands included in all reservations are removed, either wholly or partially, from such locations, and it may be said that this process of reasoning would equally apply to all other such lands. But this is not so.   At different times much land has been reserved temporarily from general, and subjected to particular locations. They remain part of the stock of lands, so to speak, devoted to the satisfaction of claims for land created by the State.   This is true of the great reservations made for the benefit of railway companies.   The lands included in them were protected from the claims of others than the beneficiaries until they were satisfied, but they remained lands to be located, the companies having precedence merely.   Lands included in such reservations were still held by the State as part of the domain out of which claimants were to be satisfied in the way and in the order provided by law.   This is further illustrated by the provision made for the disposition of lands within lapsed railway reservations, in the Act of 1876, found in Chapter 11 of Title LXXIX of the Revised Statutes of 1879. That act declared, in substance, that lands in such reservations as had lapsed after January 1, 1872, and in such as might thereafter lapse were severed from the public domain and reserved to actual settlers.   Here we have another instance in which there were lands which were held for such disposition, which were vacant, and which were included in reservations, responding accurately and naturally to all the language of the statute of 1889.   That language, wherein it speaks of reservations, uses the word as the well known name given to bodies of land defined in the laws creating the reservations out of lands subject to appropriation.   Such bodies of land, but not the islands, are, in the statutes, called reservations.   When the Legislature has had occasion to make provisions concerning both, as in the Acts of 1860 and of 1871, above referred to, both have been named, as reservations and islands.   Had it been intended to include islands in the act passed for Wallace's benefit there can be little doubt they would have been named.   It is also probable that express provision would have been made authorizing the location and survey upon islands, the laws in existence conferring no such authority.

These considerations convince us that the location in question was unauthorized and that it constitutes no obstacle to the purchase by relator.   The writ prayed for will issue.

*Mandamus awarded.*