THE STATE OF TEXAS, ET AL v. T. W. LAIN, ET AL

No. A-8109. Decided July 19, 1961
Rehearing overruled October 3, 1961
(349 S. W. 2d Series 579)

*Will Wilson,* Attorney General, and *Ben M. Harrison, James H. Rogers* and *Thomas Burrus,* Assistant Attorneys General, Austin, for petitioner.

*McLeod, Mills, Shirley & Alexander,* of Galveston, for respondent.

MR. CHIEF JUSTICE CALVERT delivered the opinion of the Court.

The nature of this suit is accurately reflected in the following statement appearing in the opinion of the Court of Civil Appeals (339 S.W. 2d 272, 273):

"Plaintiffs, alleging fee simple ownership of land adjacent to the south jetty right of way and Galveston Ship Channel, brought this action in trespass to try title against the State of Texas, the State Highway Commission and its members, the State Highway Engineer and District Engineer, the Galveston ferry manager and several ferry boat captains of the State Highway Department, all as individuals and in their official capacities. In the alternative, they alleged defendants constructed a ferry landing and dredged a channel over the property for operation of a ferry and sought to enjoin the asserted trespass. The trial court dismissed the State as a party on its plea to the jurisdiction.

"The remaining defendants presented similar pleas to the jurisdiction, asserting they acted in official capacities as agents or employees of the State, pleading sovereign immunity and that legislative consent to suit had not been granted. These pleas were overruled. They filed a not guilty plea; alleged in abatement that the land in controversy lay within a navigable harbor of a port of entry, and the Federal Government was an indispensable party; that contractual rights had intervened; that the public had acquired an easement over the submerged land. The land involved is within the boundaries of the Menard patent considered in City of Galveston v. Menard, 23 Tex. 349. Plaintiffs and defendants presented motions for summary judgment. The motion of defendants was overruled; that of plaintiffs was sustained. Judgment for title and possession was rendered for plaintiffs, and defendants were enjoined from operating ferry boats over, or from going on the land."

The parties will be referred to here as plaintiffs and defendants. The State of Texas went out of the case on its plea of sovereign immunity and our reference to "defendants" will not include the State.

The defendants appealed from the judgment of the trial court and, having superseded the judgment, have continued to operate the ferry boats over the land in controversy.

Defendants presented six points of error in their brief in the Court of Civil Appeals. The first point asserts that the suit against the members and employees of the State Highway Commission is a suit against the State and that the defendants' plea to the jurisdiction based on sovereign immunity should have been sustained. The second and third points assert that the judgment awarding plaintiffs title to and possession of the land in controversy is erroneous because plaintiffs' title is subject to rights of the public to use the land and is burdened with a servitude in favor of the public for right of access between the streets of the City of Galveston and the channel of Galveston Bay. The fourth point asserts the United States is a necessary and indispensable party to the suit. The fifth point complains of the admission in evidence of certain letters, exhibits and pleadings, and the sixth point complains of excessiveness of the supersedeas bond required by the trial court.

On original submission the Court of Civil Appeals sustained the first point of error, reversed the judgment of the trial court, dissolved the injunction and dismissed the suit. On rehearing a majority of the court held that legislative consent was not prerequisite to maintenance of the suit against the defendants, and, upon the basis of that holding, affirmed the judgment of the trial court without considering or passing on the other points of error. 339 S.W. 2d 272. The defendants have before this court essentially the same questions presented by their points of error in the Court of Civil Appeals. We granted writ of error primarily to review the question raised by the first point.

Is legislative consent to sue the state prerequisite to maintenance of suit against the defendants? On the record before us, we hold it is not.

■ The land in controversy lies between the U. S. Government jetty, constructed on Galveston Island, and the channel of Galveston Bay. It is submerged land. Defendants do not question plaintiffs' title to the land. That they do not do so is understandable. Through a regular chain of conveyances plaintiffs hold the title adjudged by this court in City of Galveston vs. Menard, 23 Tex. 349, to be good in Menard. What the defendants do contend, as is apparent from their second and third points of error, is that plaintiffs' title is a *qualified* title, subject to certain rights of the public and burdened with a servitude in favor of the public. They assert rights of use and occupancy only as state

officials and employees, acting for and on behalf of the. state, and claim no right of use and occupancy as individuals.

When suit for recovery of title to and possession of land, filed without legislative consent, is not against the state itself, but is against individuals only, the mere assertion by pleading that the defendants claim title or right of possession as officials of the state and on behalf of the state, will not bar prosecution of the suit. We did not hold otherwise in Griffin vs. Hawn, 341 S.W. 2d 151. We did hold in that case that a plea to the jurisdiction based on sovereign immunity was not available to the individual defendants in the absence of pleadings asserting title to the land in controversy to be in the state. On the record before us in that case we were required to go no further. The record in this case requires that we go further, and we do so without reluctance.

One who takes possession of another's land without legal right is no less a trespasser because he is a state official or employee, and the owner should not be required to obtain legislative consent to institute a suit to oust him simply because he asserts a good faith but overzealous claim that title or right of possession is in the state and that he is acting for and on behalf of the state. Well reasoned and authoritative decisions of the Supreme Court of the United States and of the courts of this state support the view that a plea of sovereign immunity by officials of the sovereign will not be sustained in a suit by the owner of land having the right of possession when the sovereign has neither title nor right of possession. United States vs. Lee, 106 U. S. 196, 1 S. Ct. 240, 27 L. Ed. 171; Stanley vs. Schwalby, 85 Tex. 348, 19 S.W. 264, reversed, 147 U. S. 508[1]; Whatley vs. Patten, Tex. Civ. App., 31 S.W. 60, writ refused; Imperial Sugar Co. vs. Cabell, Tex. Civ. App., 179 S.W. 83, no writ history. The rationale of the rule is that in such cases possession is not in fact held for the sovereign but it wrongfully held.

■ When in this state the sovereign is made a party defendant to a suit for land, without legislative consent, its plea to the jurisdiction of the court based on sovereign immunity should be sustained in limine. But the cited cases clearly recognize that when officials of the state are the only defendants, or the only remaining defendants, and they file a plea to the jurisdiction

---

1 For a full history of this litigation, see also U.S. vs. Schwalby, 8 Tex. Civ. App., 679, 29 S.W. 90; 87 Tex. 604, 30 S.W. 435; Stanley vs. Schwalby, 162 U.S. 255.

based on sovereign immunity, it is the duty of the court to hear evidence on the issue of title and right of possession and to delay action on the plea until the evidence is in. If the plaintiff fails to establish his title and right of possession, a take nothing judgment should be entered against him as in other trespass to try title cases. If the evidence establishes superior title and right of possession in the sovereign, the officials are rightfully in possession of the sovereign's land as agents of the sovereign and their plea to the jurisdiction based on sovereign immunity should be sustained. If, on the other hand, the evidence establishes superior title and right of possession in the plaintiff, possession by officials of the sovereign is wrongful and the plaintiff is entitled to relief. In that event the plea to the jurisdiction based on sovereign immunity should be overruled and appropriate relief should be awarded against those in possession. That those wrongfully claiming title or the right of possession are sued in their official capacities as well as individually cannot alter the rule. To hold otherwise would exalt form over substance. If the claim is only for and on behalf of the sovereign, it cannot be material whether the "official" nature of the claim is asserted in the plaintiffs' petition or in the defendants' answer. The judgment against the individuals, predicated as it is upon an incidental determination that title and right of possession is in the plaintiff, is not binding on the sovereign.

United States Supreme Court decisions in this field were reviewed at length by both Chief Justice Vinson, writing for the court, and Justice Frankfurter, dissenting, in Larson vs. Domestic and Foreign Commerce Corp., 337 U.S. 682, 93 L.Ed. 1628. While they were in disagreement as to whether the rule as we have stated it applies also in cases involving disputes as to contractual rights to personal property, both affirmed its applicability in cases in which an unconstitutional taking or damaging of property without due process and without just compensation is asserted. Walsh vs. University of Texas, Tex. Civ. App., 169 S.W. 2d 993, writ refused, is cited by defendants for a different conclusion. That decision seems to be distinguishable only on the ground that the defendants were not sued as individuals. We doubt that that is a sound basis of distinction. The decision is out of harmony with the long line of prior decisions by our courts and by the Supreme Court of the United States and may no longer be regarded as authoritative.

We are thus confronted with the necessity of determining whether the plaintiffs' admitted title is servient to the uses being

made of the land by the defendants. Defendants have dredged out the soil in the area between the jetty and the channel of the bay and have placed pilings in the area to provide a channel and landing for their ferry boats, thus completely appropriating the area to their own use to the exclusion of the plaintiffs and the uses to which they may wish to put it. The principal reason given by the defendants for their appropriation and use of the land is that plaintiffs' title is subject to the right of the public to use the premises for navigation and other reasonable purposes. Defendants urge that the original grant to Menard did not, and could not, convey these public rights to an individual. This question was long since foreclosed against defendants' position by the decision of this court in City of Galveston vs. Menard, 23 Tex. 349.

Plaintiffs' title had its inception in a grant by the Republic of Texas to Michael B. Menard. It would serve no useful purpose to review at length either the circumstances surrounding the grant or the opinion of this court in the Menard case. The grant admittedly included the submerged land in controversy here. By an Act of the Congress of the Republic of Texas on December 9, 1836, *all of the right, title, claim and interest* which the Republic had in one league and one labor of land, lying and situate on, and including the East end of Galveston Island, was relinquished to and vested in Michael B. Menard, and the President of the Republic was directed to quitclaim the land to Menard upon payment of the sum of $50,000. A fifteen acre tract and a suitable block of lots for the erection of a customs house were reserved from the grant. The reserved tracts are not involved in this suit.

Pursuant to the Act of Congress, President Houston, on January 25, 1838, patented to Menard land described by metes and bounds as surveyed by R. C. Trimble and William Lindsey. The northern boundary of the grant ran "eastwardly with the Channel of the Harbor in the Bay of Galveston and with the general course of said [Galveston] Island at the distance of at least one hundred and fifty varas from the shore."

The City of Galveston was incorporated by an Act of the Congress of the Republic of Texas, approved February 5, 1840. 2 Gammel's Laws of Texas 440.

In 1851, the Legislature of the State of Texas passed an Act, approved December 8, 1851, (3 Gammel's Laws of Texas 1043)

granting certain powers to the City of Galveston. Section 1 of the Act granted the City the power of opening the streets running north and south on the bay side of the City to the channel and to erect wharves at the end of the streets. Section 3 granted to the City power "to fill such portions of the flat covered by water, between ordinary low tide water mark, and the channel on the Bay side." Section 4 provided that nothing in the third and fourth sections should be "construed to affect any legal title to wharf privileges held by persons in said City."

Another Act of the Legislature, passed and approved February 16, 1852 (3 Gammel's Laws of Texas 1229) and expressly designed as supplementary to the Act of December 8, 1851, declares that nothing in the first Act "shall be so construed as to alter or impair any of the rights heretofore conveyed to 'Michael B. Menard, his heirs and assigns.'"

The grant to Menard and the other congressional and legislature Acts listed above were before the court when City of Galveston vs. Menard was decided. The power and intent of the Republic to grant the submerged area included in the patent to Menard in derogation of public rights of navigation, etc., was fully considered. The court confirmed the existence of both power and intent and recognized the absolute right of Menard and his grantees to fill up and use the submerged areas, subject only to the right of the City to open streets across the land to the channel and to build and operate wharves at the end of the streets. Defendants cite Illinois Central Railroad Co. vs. Illinois, 146 U.S. 387 and Darling vs. City of Newport News, 249 U.S. 540 as reaching results contrary to the result reached by this court in the Menard case. We need not review the cited cases, for we regard our own decision as controlling. Valuable property rights have been acquired and vast sums of money expended on the basis of our decision upholding the validity of the grant and delineating the respective rights of the patentee and his grantees on the one hand and of the public as represented by the City of Galveston on the other. Plaintiffs do not seek by this suit to interfere with the passage of light craft over their land, and there is no indication that they will interfere with that type of public use while the land is covered with water. What they do seek is to prevent the defendants from confiscating their property, without just compensation, and appropriating it to a use inconsistent with their rights.

The record discloses that in 1888 the United States obtained

a fifty foot easement, roughly along the shore of the east end of Galveston Island, from plaintiffs' predecessors in title, and erected a jetty over the easement running in a Northeasterly direction at the point in controversy. The streets of the City running north and south are numbered streets. First to Sixth Streets lie east of the County sea wall and as surveyed on the ground have a northern terminus at Avenue A, a considerable distance south of the jetty right-of-way. If Second Street were opened on its direct northern course it would intersect the jetty.

Defendants began the ferry operations in 1943. On March 3, 1944 the City of Galveston adopted two resolutions presented by the State Highway Department. The resolutions, considered together, recited that the State Highway Department desired to expend certain funds within the corporate limits of the City constructing "State Highway No. 87 from Seawall Boulevard to New Galveston Ferry Landing through the City of Galveston over Second Street and new location", and agreed that the State Highway Department might maintain the improvements, that no encroachments on the right-of-way would be permitted, and that the speed limit thereon would not be fixed at less than 30 miles per hour. Pursuant to that authority the State Highway Department purchased from plaintiffs' predecessor in title the necessary right-of-way to build the highway. The highway ties to the north end of Second Street at Avenue A from which point it curves to the east, crossing and passing beyond any future direct extension of First Street, thence curving back in a slightly northwesterly direction to its intersection with the United States jetty easement. The tract in controversy, although of much greater width than the streets of the City of Galveston, lies on the north side of the jetty directly opposite the terminus of the highway.

A map of a section of the east end of Galveston Island showing City streets, State Highway No. 87, the U. S. jetty right-of-way and the area in controversy is attached.

The court recognized in the Menard case, as indicated above, that the grant to Menard was subject to the right of the City of Galveston to open streets running north and south across the plaintiffs' land to the channel of Galveston Bay. Defendants assert that their appropriation of the land in controversy is an exercise of that right. Plaintiffs suggest several reasons why the appropriation of their land cannot be justified on the basis

Oct., 1961

N

STATE HIGHWAY No. 87

Harbor Line

GALVESTON CHANNEL

North Boundary Menard Patent

Area in Dispute

Easterly City Limits

Jetty Right-of-Way

Ave. A

6th Street

5th Street

4th Street

3rd Street

2nd Street

1st Street

County

Seawall

Seawall Boulevard

of the authority of the City to construct and open streets to the channel of the bay. We need to consider but one.

The construction of the highway from the terminus of Second Street at Avenue A to the jetty easement is not, and on the face of the record before us does not purport to be, City action extending Second Street to the channel of the bay. The resolutions of the City Council do not authorize an extension of Second Street; they only authorized the State Highway Department to construct a state highway within the City's corporate limits. Whether under the decision in City of Galveston vs. Menard the City could have constructed an extension of a street outside of the original corporate limits, or departing from the original course of the streets as surveyed, and thereby have established a right to use submerged land in constructing the ferry channel and landing are matters we find unnecessary to decide.

We conclude that plaintiffs' title to the land in controversy is not servient to the public rights which the defendants assert.

The United States of America is not a necessary party to the suit. The plaintiffs seek only to recover the title to and possession of their land from the defendants and to enjoin their use of the land. Neither the adjudication of title and right of possession to plaintiffs, nor the injunction, interfere in any way with the rights and powers of the government of the United States.

The exhibits, letters and pleadings admitted in evidence over defendants' objection are immaterial to a proper decision of the case.

■ The record before us indicates that the trial judge did not abuse his discretion in fixing the amount of the supersedeas bond at $7,500.00 Moreover, the defendants having made bond in that sum have no sound basis for complaint.

This disposes of all the questions of law in the case. The defendants suggest that dire consequences will follow an affirmance of the judgments below and the termination of the operation of the ferry boats. If those consequences ensue, responsibility rests with the State of Texas. The State was made a party to the plaintiffs' suit. While it had a legal right to file its plea of sovereign immunity, it was not required to do so. Under the express provisions of Article 3269, Vernon's Annotated Texas Statutes, the State, by remaining in the suit as a party de-

fendant, could have challenged the plaintiffs' title and, alternatively, could have sought condemnation of the plaintiffs' property. Had it done so, operation of the ferry could not have been enjoined. City of Houston vs. Adams, 154 Tex. 448, 279 S.W. 2d 308. The defendants remaining in the case could not assert the rights and remedies provided by Art. 3269. Only the State itself could assert them. If interruption of public travel and public inconvenience follow this decision it cannot be attributed to evil purposes of the plaintiffs; it can only flow from the reluctance of the State to litigate its right to appropriate and use the property and its failure to condemn by cross-bill and to pay just compensation for the property.

The judgments of the Court of Civil Appeals and trial court are affirmed.

CULVER, Justice (dissenting).

The point of my disagreement with the court's decision relates to the question of the State's right to possession and use of this land for highway purposes. In 1943 the State Highway Commission entered upon a project to construct State Highway No. 87 northward from Second Street and operate ferry service across the Galveston channel and thence connecting across the Texas Coast. With full knowledge of that plan and in furtherance thereof respondents' predecessors in title sold and conveyed the right-of-way up to the area in dispute, knowing full well that the highway would be extended across the flats and submerged land, that the wharf or terminal facilities would be established, and the ferry service put into operation. The highway was constructed at considerable cost, ferry terminal built ferry boats purchased and put into operation and until 1951 no objection was raised nor was the right of the State to the possession of this right-of-way and to the operation of ferry boats questioned by either respondents or their predecessors in title.

Summary judgment was rendered by the trial court in favor of the respondents decreeing title and right of possession in them as against the State Highway Commission of Texas and the members thereof individually and in their official capacity and against officials and employees of the State of Texas individually and officially.

The trial court also perpetually enjoined the State Highway

Commission, the Texas Highway Department, and all of the defendants, both as state officials and employees and individually from going in or upon the premises and from operating ferry boats or other means of transportation thereover.

Respondents' vendors evidently construed their grant from the State of Texas, as qualified and explained by later legislative enactments, to provide for the construction of streets and thoroughfares over this land and tacitly, if not expressly, consented to its use by the State for that purpose.

I am of the opinion that the title held by respondents is not an absolute one but is burdened with a public interest, namely, the right on the part of the public —the City— of access to the channel over the flats and submerged land granted to Menard.

In City of Galveston v. Menard, 23 Tex. 349, the court construes this grant by the State of Texas as follows:

"In view of the full force of this rule of construction, we are satisfied, that this legislative grant was intended by the contracting parties to include the flats, so as to build a city upon Galveston island, with streets and lots running up to, and bordering on the channel of the bay." (P. 398)

"That the private appropriation of lots on the channel, for wharves, was contemplated, and that streets were to be left open for public use, out to the channel, was abundantly illustrated by the practical action of the founders of the city, in reference to the subject." (P. 403)

"The right, then, of Menard, and his vendees, to the soil in the flats, in front of the lots, out to the channel, is fully recognized. This may, in the course of time, when they are reclaimed, by being filled up, so as to become the site of business houses, be subject to the right of opening cross streets, when it can be practically done, and where such right may not have been lost." (P. 408)

"The right, also of the city to the opening, improvement, and use of the streets, running out to the channel, with the right to build and control wharves in front of them, is fully recognized." (P. 408)

The decision on the merits of this case turns almost wholly

upon the interpretation of the law as announced in Galveston v. Menard. The opinion in that case delineated the correlative rights and property relationship of Menard's assigns and public. As pointed out the sole purpose that the Legislature had in mind in making this unusual grant to Menard was to build a commercial city and a port of entry on the channel and in the language used by the court which I re-emphasize:

"* * * not to be shut up and taxed for private aggrandizement, but to give it ultimately the means of self-preservation, by a control of the appropriate avenues to the channel of commerce, upon which it was built, whenever it became able to establish and improve them. 23 Tex. at page 405.

The City of Galveston was to be developed upon an island. It was envisioned as an important port on account of its excellent and easily-accesible harbor. The court in Menard again and again demonstrates that the public was entitled to reasonable access to the harbor over the flats and the shore and that the Legislature so intended as necessary to the growth and development of a city and a port.

The legislative Act approved December 8, 1851, which expressly confers upon the City of Galveston the right and privilege of opening streets to the channel and to erect wharves at the end of the streets is discussed by the court and held to be declaratory of the legislative intent when the Menard grant was made.[2] The respondents here do not otherwise contend.

---

2 Laws of the State of Texas 1851-52, Vol. 4, Part 2, Chap. 13, pp. 11-12

"Section 1. *Be it enacted by the Legislature of the State of Texas*, That the corporation of the City of Galveston shall have the power and privilege of opening all the streets running North and South on the Bay side of said City to the channel; and shall also have the power and right to erect wharves at the end of such streets as they may deem proper.

"Sec. 2. That the said corporation shall have power to fix the rates of wharfage and to collect the same, on all goods, wares and merchandise, landed upon said wharf or wharves; to bring suit to recover the same before any Court having jurisdiction of the amount in controversy.

"Sec. 3. That the said corporation shall have the power to fill up such portions of the flat covered by water, between ordinary low tide water mark, and the channel on the Bay side, as said corporation may deem necessary for public purposes.

"Sec. 4. That the State of Texas hereby relinquishes and releases unto the corporation of the city of Galveston, all the rights and privileges above mentioned; *provided,* that nothing in the third and fourth sections of this act shall be construed to affect any legal title to wharf privileges held by persons in said City; and that this act take effect and be in force from and after its passage.

"Approved, December 8, 1951."

The majority in this connection also refer to an act of the Legislature of February 16, 1852 (Laws of the State of Texas, 1851-52, Vol. 4, Part 2, Ch. 78, p. 181), declaring that nothing in the Act of December 8, 1851 "shall be so construed as to alter or impair any of the rights heretofore conveyed to Michael B. Menard, his heirs and assigns." It is not to be implied that this later act in any way limited the rights granted in the former act to the city of opening streets and erecting wharves at the end of the streets. As demonstrative of that fact, the Act of February 16, 1852, additionally provides "that this act shall not be construed so as to prevent the Mayor, Aldermen and inhabitants of the City of Galveston from erecting wharves and collecting wharfage in front of streets running from the gulf to the bay, not occupied at the time of the passage of this act by wharves owned by individuals." At any rate, this court in Menard construed these acts in connection with the original grant and sets that question at rest.

For the following reasons the respondents deny the right of the State to occupy the land in question for highway purposes and for terminal facilities and the operation of ferry service across the channel. (1) The language in Section 1 of the 1951 Act empowers the City only to open up the streets that existed within the corporate limits of the City of Galveston at that time; that if the City had power to open additional streets to the channel it would have the right to destroy many plants and installations that had theretofore been erected and build on the validity of the Menard patent. (2) The dredged-out portion of the land being used as a ferry channel is not in fact the opening up of a street within the meaning of Section 1, Act 1851; that while the highway does connect with Second Street the right-of-way was not in a direct line but curved to the east and could just as easily have been connected with First or Third Streets; that since it is not a continuation of Second Street upon the same course and distance it cannot be considered as an opening up of Second Street. (3) Highway 87 was not intended by the City as an extension of Second Street because the area between the end of Second Street and the channel has been built up with homes and other structures. (4) The City of Galveston has not attempted to declare State Highway 87 as an extension of Second Street and has not taken any formal and affirmative action toward that end. (5) The right to extend streets to the channel and build wharves did not include the right to dredge out the soil and operate a ferry. (6) At all events any opening up of Second Street, the City and the State would be limited to an 80-

foot street and not be allowed to install the ferry terminal facilities which would require a greater width.

The majority have thought it only necessary to discuss the reason assigned in No. 4, namely, that the resolutions of the City Council do not purport to authorize an extension of Second Street, but only authorized the State Highway Department to construct a state highway within the City's corporate limits. The other reasons assigned are not decided. I assumed the majority singled out this as the one most compelling to their decision.

In my opinion the majority have too narrowly construed the grant of power and the purposes for which the power was granted. The import is that if the City had taken formal action and by resolutions authorized an extension of Second Street this action would have sufficiently empowered the state authorities to take possession of the necessary right-of-way over this tract and construct its highway and facilities thereon, at least absent the other objections.

In my opinion the grant and explanatory legislation pertaining thereto and as construed in Menard gave the City and the public the right of reasonable access to the channel for the normal development and growth of the City. It is immaterial and unimportant that the formal resolutions adopted by the City described the route as a highway instead of a street. The right existed in either event. It is to be recalled that after the resolutions were adopted the highway and terminal facilities were constructed. It was not until eight years thereafter when for the first time complaint was made. It would seem that if there had been any objection as to the form or nature of the resolutions the objection should have been timely raised rather than to wait until the state has spent a tremendous amount of money in affording this means of ingress and egress to the citizens of Galveston and the members of the public generally.

None of the other reasons assigned by the respondents, I think, are valid. In my opinion the power of the City to open streets was not limited to those streets that were within the corporate limits of the City at the time of the act of incorporation.

The following two quotations from the Menard case, to my mind, are clearly indicative of the contrary:

"By the strict letter of the legislative grant, Menard's right of property did not extend to the channel. It is extended there, only by resort to the plain intention of the contracting parties. Shall it be extended, then, for the benefit of one contracting party, and not the other? That would pre-suppose that the object of the government, was to enable him to make a private speculation. Whatever may have been his object, the only object which, it can be presumed, the government had, was to build a commercial city, and port of entry, on this channel; not to be shut up and taxed for private aggrandizement, but to give it ultimately the means of self-preservation, by a control of the appropriate avenues to the channel of commerce, upon which it was built, whenever it became able to establish and improve them." 23 Tex. at Page 405.

"The appropriation of the streets to the channel in front of these laid off, according to the plan of the town, by the understanding of the contracting parties in its foundation, was necessarily prospective, from the condition of things at the time of the grant, and at the time of laying off the city, and selling the lots; * * *." 23 Tex. at Page 407.

Again, there is no conclusion to be drawn from Menard or from the 1951 Act that the street must be extended in a direct projection and that it cannot be curved somewhat on account of th lay of the land or for other reasons. At any rate the extension was in a northerly direction to the channel. So far as the right to dredge out the soil and operate a ferry is concerned, I think this power is implicit. Express permission is granted the City to build wharves on or over the land, the only limitation being that it could not interfere with wharves already established by private individuals. By definition a wharf is but a dock where passengers or freight may be discharged or otherwise taken aboard. Webster's New International Dictionary, Second Edition.

In my opinion the grant to Menard was clearly burdened with the public right of reasonable access to and from the island across the flats, submerged lands and the channel, and in summary that is the only right that is claimed here on behalf of the State and the public, and the only right which is being contested.

I do not share respondents' anxiety over the destruction of

wharves, docks, boat clubs and other installations erected on the flats and over the submerged land by subsequent opening up of streets or highways in the future should petitioners' position be upheld. That is clearly enjoined by the Menard decision. The right to open the streets is limited by rights that have become vested in others by actual occupation and user. In this case the land occupied by the Highway Commission for the benefit of the State of Texas and the public was not being put to any other use. It was vacant and unoccupied.

I would reverse and render in favor of petitioners.