**Affirmed and Opinion filed September 30, 2021.**



In The

# Fourteenth Court of Appeals

### NO. 14-19-00708-CV

### WEST GULF MARINE, LTD., Appellant

### V.

### TEXAS GENERAL LAND OFFICE AND GEORGE P. BUSH, Appellees

**On Appeal from the 10th District Court
Galveston County, Texas
Trial Court Cause No. 18-CV-1681**

## OPINION

This interlocutory appeal concerns a title dispute over submerged land in Galveston Bay. Appellant West Gulf Marine, Ltd. ("West Gulf") appeals a plea to the jurisdiction granted in favor of appellees the Texas General Land Office ("GLO") and its Commissioner George P. Bush. *See* Tex. Civ. Prac. & Rem. Code Ann. § 51.014(8) (authorizing interlocutory appeal from grant or denial of plea to the jurisdiction). In three issues, West Gulf argues the trial court erred when it granted appellees' plea because: (1) West Gulf is the present-day owner of the

disputed submerged property; (2) West Gulf has standing to sue because it is the owner of the disputed submerged property; and (3) GLO committed a taking of the submerged property by offering to lease it to West Gulf. We affirm.

## I.  BACKGROUND

West Gulf owns two lots on the bay side of Galveston Island: lots 30 and 31 in Section One of the Trimble and Lindsey Survey.[1] West Gulf traces its ownership of lot 30 to a land patent from The Republic of Texas (the "Republic") to General Thomas Jefferson Chambers in 1839. As to lot 31, West Gulf traces its ownership to a land patent from the Republic to John O'Brian in 1840. The relevant patents conveying the lots provide that lot 30 contained 13.50 acres and lot 31 contained 13.85 acres.

According to West Gulf, over half of the land in the lots originally conveyed by the Republic has eroded with the passage of time and is now submerged under water in the bay.[2] GLO has represented to West Gulf that the land submerged in water in the bay by the passage of time belongs to the State. On the lots, West Gulf

---

[1] In 1837, R.C. Trimble and William Lindsey surveyed Galveston Island under special authority granted by the Congress of the Republic of Texas. Act approved June 12, 1837, § 1, 1st Cong., 2d S., 1836–1837 Repub. Tex. Laws 267, 267, *reprinted in* 1 H.P.N. Gammel, *The Laws of Texas 1822–1897*, at 1327 (Austin, Gammel Book Co. 1898) ("That the secretary of the treasury be, and he is authorized and required to cause the Island of Galveston except the league and labor sold to M. B. Menard and associates, and all other Islands within this Republic to be surveyed."); *see State v. Lain*, 349 S.W.2d 579, 583 (Tex. 1961); *City of Galveston v. Menard*, 23 Tex. 349, 399–400 (Tex. 1859). Their survey, with subsequent legislative acts and patents issued thereon, has stood as the basis of title on Galveston Island. *State of Texas v. Chuoke*, 154 F.2d 1, 3 (5th Cir. 1946); *see Lain*, 349 S.W.2d at 554; *Menard*, 23 Tex. at 399–400. For purposes of deciding this appeal, we accept the parties' representation that the metes and bounds from the Trimble and Lindsey survey have been lost to the passage of time or were never drawn up.

[2] Erosion is the process of wearing away the land, while accretion is the process of gradual enlargement. *Coastal Indus. Water Auth. v. York*, 532 S.W.2d 949, 952 (Tex. 1976); *State v. Balli*, 190 S.W.3d 71, 100–01 (Tex. 1944); *see TH Invs., Inc v. Kirby Inland Marine, L.P.*, 218 S.W.3d 173, 184–85 (Tex. App.—Houston [14th Dist.] 2007, pet. denied) ("Decreases in tidal lands generally are caused by erosion, which gradually and imperceptibly wears away the land.").

2

operates a shipyard and is engaged primarily in the construction of barges. Access to a deep-water shoreline is an integral component of West Gulf's business, as it allows West Gulf to launch and move barges after construction.

To prevent further shoreline erosion, West Gulf alleges it must engage in bulkheading efforts.[3] In 2010, West Gulf and GLO executed a commercial easement lease to allow West Gulf to make changes to the shoreline and submerged land and to bulkhead portions of the lots' then-existing shoreline. Under the terms of this lease, West Gulf dredged an area of approximately 33,000 square feet of submerged land. The lease includes a provision acknowledging that West Gulf "disputes the [State's] ownership of the Easement premises." West Gulf agreed to pay $444.00 in annual rental payments for the lease, with the ten-year term for the easement ending on December 31, 2019.

In 2015, West Gulf sought to amend its lease to allow additional dredging and further modification to the shorelines as it sought to expand its operations. In January 2017, GLO proposed a new ten-year "coastal surface lease" that would grant West Gulf an expanded easement allowing for West Gulf's projects. The newly proposed lease would expire on November 30, 2026, and required West Gulf to pay an annual payment of $94,999.10 and a $100 renewal fee. Our record indicates that the parties did not sign the lease.

On December 7, 2018, West Gulf filed the underlying suit against appellees asserting causes of action for trespass to try title and inverse condemnation. West Gulf sought to have title declared as to the entirety of lots 30 and 31, including any

---

[3] "Bulkheads are concrete structures, designed to prevent beach erosion." *Steptoe v. True*, 38 S.W.3d 213, 215 n.3 (Tex. App.—Houston [14th Dist.] 2001, no pet.); *see also Tesoro Marine Servs., Inc. v. Bagby*, No. 04-03-00272-CV, 2004 WL 2450872, at *6 (Tex. App.—San Antonio Nov. 3, 2004, pet. denied) (mem. op.).

submerged land that GLO argued belonged to the State.[4] West Gulf alleged that the original patents from the Republic conveyed title to land subsequently submerged by water, and therefore, title to any portion of the land subsequently submerged by water did not revert to the State.

Appellees filed a plea to the jurisdiction arguing that the submerged portions of the property belonged to the State. Specifically, appellees argued that the patents executed by the Republic did not convey title to submerged land because: (1) the relevant legislative authority did not indicate an intent to convey submerged land, and (2) "[n]either of the original patents that conveyed Lots 30 and 31 from the sovereign expresses an intent to convey submerged land."

West Gulf filed a response and argued that "the Republic of Texas acting through its Congress, conveyed the lots containing the submerged land . . . at issue to private persons to pay its debts and to meet the exigencies of government." Both parties submitted evidence in support of their arguments, including the relevant legislative acts of the Republic providing for the sale of both lots, the conveyances of the lots from the Republic to O'Brian and Chambers, the Trimble and Lindsey survey, and the Phelan map.[5] Appellees submitted an affidavit by Nedra Foster

---

[4] In its live pleading, West Gulf defines the "Property" as "Lots 30 and 31 in Section Number One of the Trimble and Lindsey Survey of Galveston Island (the 'Property')." Under a section titled "CAUSES OF ACTION," West Gulf's live petition stated: "West Gulf brings this action for trespass to try title against Commissioner Bush under Texas Property Code [§] 22.001, *et. seq.*, and request[s] judgment as to its title claim to the Property." West Gulf's requested relief, in relevant part, asked for a judgment declaring that "West Gulf is the legal and equitable owner of the Property and has title to the Property in fee simple; [and] Defendant Bush has no right of ownership or claim to the Property . . . ."

[5] The Phelan map is a map of Galveston Island containing the names of the individuals who purchased lots on it and their respective patent numbers. The Republic's patent conveying lot 30 to Chambers and the patent conveying lot 31 to O'Brian refer to both the Trimble and Lindsey survey and the Phelan map. According to Nedra Foster Townsend, appellees' expert, "[t]his map contains names of persons on particular lots who have purchased them. Lot 30 shows to be 13.50 acres and shows T.J. Chambers along with Patent Number 22; Lot 31 shows to be 13.85 acres to

4

Townsend, a professional land surveyor, stating her opinion that West Gulf's ownership was "subject to movement with the occurrence of erosion and accretion." West Gulf attached to its response the opinion of Blake E. Horton, a landman. According to Horton, "it was not until the early 1900s that the instruments [conveying lots 30 and 31] began to include calls to specific metes and bounds." Horton provided that it was his opinion that "these deeds intended to and did convey a specific amount of acreage."

After a hearing, the trial court found that the State owns the submerged lands and granted appellees' plea to the jurisdiction. This interlocutory appeal followed.[6] *See id.*

## II. DISCUSSION

In its first issue, West Gulf argues that the trial court erred when it granted

---

J. O'Brian along with Patent Number 133." We are unable to discern whether the map contains this information based on the copy of the map in the record.

[6] In its brief, West Gulf states "[t]his is a standard appeal of a final judgment" and asserts that, "[a]lthough there is some discussion in the record regarding a remaining issue pending in the trial court regarding the placement of the littoral boundary for property that was previously submerged and then later filled in (for which the State charges a lease), West Gulf is not disputing the littoral boundary claimed by the []GLO." During oral argument before this Court, West Gulf stated "we took the position that there is [sic] no remaining issues to be handled at the trial court. Either way it is a timely appeal and this court has jurisdiction. We take the position that if the court were to . . . uphold the plea to the jurisdiction the entire case would be resolved." We disagree.

As noted above, West Gulf's petition asserted causes of action and sought relief as to the entirety of lots 30 and 31, and appellees' plea only resolved West Gulf's claims as to the submerged portion of the lots. The 2010 lease executed by the parties provides that West Gulf "waives any right to claim ownership of Coastal Public Land as a result of artificial accretion caused by deposition of dredge material." Appellees' counsel argued at oral argument that title remains to be resolved as to a part of the lots that was artificially modified to become dry land. We agree with appellees. *See Lorino v. Crawford Packing Co.*, 175 S.W.2d 410, 414 (Tex. 1943) ("Accretions along the shores of the Gulf of Mexico and bays which have been added by artificial means do not belong to the upland owners, but remain property of the State."). Therefore, appellees' plea to the jurisdiction did not dispose of West Gulf's entire cause of action for trespass to try title, and thus, this is an interlocutory appeal.

appellees' plea because it is the owner of the submerged property. West Gulf advances several arguments in support of its contention that the Republic conveyed to Chambers and O'Brian title to the land subsequently submerged by water. Specifically, West Gulf argues that: (1) the State's reservation of all of the islands in 1836 mandates that the title in the submerged lands did not revert to the State; (2) a "call to acreage" in the patents to O'Brian and Chambers indicated the State intended to convey the submerged property; and (3) the facts of this case meet "a test" articulated by the Texas Supreme Court indicating that the conveyance included title to the submerged lands.

## A. STANDARD OF REVIEW

A plea to the jurisdiction is a dilatory plea used to defeat a cause of action without regard to whether the claims asserted have merit. *Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 554 (Tex. 2000). The plea challenges the trial court's subject matter jurisdiction. *Id.* Whether a trial court has subject matter jurisdiction and whether the pleader has alleged facts that affirmatively demonstrate the trial court's subject matter jurisdiction are questions of law that we review de novo. *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226 (Tex. 2004).

The plaintiff has the initial burden to plead facts affirmatively showing that the trial court has jurisdiction. *Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 446 (Tex. 1993); *see Mission Consol. Indep. Sch. Dist. v. Garcia*, 372 S.W.3d 629, 635 (Tex. 2012). If the plaintiff pleaded facts establishing a prima facie case and the governmental unit instead challenges the existence of jurisdictional facts, then we consider the relevant evidence submitted. *Metro. Transit Auth. of Harris Cty. v. Douglas*, 544 S.W.3d 486, 492 (Tex. App.—Houston [14th Dist.] 2018, pet. denied); *see Garcia*, 372 S.W.3d at 635; *Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 554 (Tex. 2000). When reviewing a plea to the jurisdiction in which the

6

pleading requirement has been met and evidence has been submitted to support the plea that implicates the merits of the case, we take as true all evidence favorable to the plaintiff. *Douglas*, 544 S.W.3d at 492; *see Garcia*, 372 S.W.3d at 635. We indulge every reasonable inference and resolve any doubts in the plaintiff's favor. *Douglas*, 544 S.W.3d at 492; *see Miranda*, 133 S.W.3d at 226. If the relevant evidence is undisputed or if the plaintiff fails to raise a fact question on the jurisdictional issue, then the trial court rules on the plea as a matter of law. *Garcia*, 372 S.W.3d at 635; *see Harris Cty. Flood Control Dist. v. Kerr*, 499 S.W.3d 793, 798–99 (Tex. 2016) (op. on reh'g).

## B.    APPLICABLE LAW

The general rule is that a riparian or littoral[7] owner acquires or loses title to the land gradually or imperceptibly added to or taken from his shoreline. *Natland Corp.*, 865 S.W.2d at 57.

"The law governing ownership of submerged lands in Texas has a long history." *Bush v. Lone Oak Club, LLC*, 601 S.W.3d 639, 647–48 (Tex. 2020). Title to land covered by the bays, inlets, and arms of the Gulf of Mexico within tidewater limits rests in the State, and those lands constitute public property that is held in trust for the use and benefit of the people.[8] *Severance v. Patterson*, 370 S.W.3d 705, 715 (Tex. 2012); *Lorino v. Crawford Packing Co.*, 175 S.W.2d 410, 413 (Tex. 1943);

---

[7] "The term 'littoral' means 'belonging to the shore,' and a 'littoral owner' is one whose land borders an ocean, sea, or lake." *TH Invs.*, 218 S.W.3d at 184–85.

[8] The reason for this distinction between ordinary public lands and those covered by navigable waters is obvious. It has always been the policy of the State to dispose of ordinary public lands to settlers, and under usual circumstances it may be presumed that the State has parted with title; but navigable waters and streams are reserved to the State for the use of the public generally, and no one should have an exclusive right to the enjoyment of such property, unless and until the Legislature has granted such right.

*Lorino v. Crawford Packing Co.*, 175 S.W.2d 410, 414 (Tex. 1943).

*TH Invs.*, 218 S.W.3d at 182; *see also* Tex. Nat. Res. Code Ann. §§ 11.011, 11.012(c); *Porretto v. Tex. Gen. Land Office*, 448 S.W.3d 393, 395 (Tex. 2014) ("The State owns the coastal land submerged by the Gulf of Mexico."); *Natland Corp. v. Baker's Port, Inc.*, 865 S.W.2d 52, 57 (Tex. App.—Corpus Christi–Edinburg 1993, writ denied).

Only the Legislature can grant to private parties the title to submerged lands that are part of the public trust, and it must expressly provide for such a grant in plain and positive language. *See Bush*, 601 S.W.3d at 646 ("Texas law permits the Legislature to convey public land under both streams and the sea so long as the conveyance meets certain requirements."); *Lorino*, 175 S.W.2d at 414 ("[N]avigable waters[9] and streams are reserved to the State for the use of the public generally, and no one should have exclusive right to the enjoyment of such property, unless and until the Legislature has granted such right."); *State v. Bradford*, 50 S.W.2d 1065, 1075 (Tex. 1932) ("[B]efore a statute will be construed to include land under navigable waters, . . . it will have to be expressed in plain and positive language and not in general language."); *TH Invs.*, 218 S.W.3d at 185 ("Property conveyed by the State to an individual can remain privately owned even if it is submerged under tide waters—but only under very special circumstances in which the State manifested its intent that the private landowner continue to own the property if submerged."). Thus, two presumptions arise regarding submerged lands: (1) they are owned by the State, and (2) the State has not acted to divest itself of title to them. *TH Invs.*, 218 S.W.3d at 182–83; *see Lorino*, 175 S.W.2d at 414.

## C.   SOVEREIGN IMMUNITY

A suit to try the State's title is barred by sovereign immunity. *See Tex. Parks*

---

[9] "The bays, inlets, and other waters along the Gulf Coast which are subject to the ebb and flow of the tide of the Gulf of Mexico are defined as 'navigable waters.'" *Id.*

*& Wildlife Dep't v. Sawyer Tr.*, 354 S.W.3d 384, 393 (Tex. 2011). However, a suit against a state official for acting outside his authority is not barred by sovereign immunity. *Id.*; *see Heinrich,* 284 S.W.3d at 370–74; *State v. Lain*, 349 S.W.2d 579, 581 (Tex. 1961). If a government official acting in his official capacity possesses property without authority, then possession is not legally that of the sovereign. *Sawyer Tr.*, 354 S.W.3d at 393. Under such circumstances, a defendant official's claim that title or possession is on behalf of the State will not bar the suit. *Id.*; *see Lain,* 349 S.W.2d at 581–83.

A suit to recover possession of property unlawfully claimed by a state official is essentially a suit to compel a state official to act within the officer's statutory or constitutional authority, and the remedy of compelling return of land illegally held is prospective in nature. *Sawyer Tr.*, 354 S.W.3d at 393; *see Chambers Liberty Ctys. Navigation Dist. v. State*, 575 S.W.3d 339, 348 (Tex. 2019) (orig. proceeding) ("Such 'ultra vires claims' must be brought against government officials in their official capacity and may seek only prospective injunctive remedies."). However, if the evidence establishes superior title and right of possession in the sovereign, then the officials are rightfully in possession of the sovereign's land as agents of the sovereign and their plea to the jurisdiction based on sovereign immunity should be sustained. *Lain*, 349 S.W.2d at 582; *see Sawyer Tr.*, 345 S.W.3d at 394.

## D.   ANALYSIS

Here, West Gulf's suit for inverse condemnation and trespass to try title is a suit over ownership of the submerged lands, which West Gulf alleges is unlawfully claimed by GLO and its Commissioner. Thus, if the State owns the submerged lands, sovereign immunity bars West Gulf's suit against appellees as to the submerged lands. *See Sawyer Tr.*, 345 S.W.3d at 394; *Lain*, 349 S.W.2d at 582.

Our disposition of the immunity question requires us to review: (1) the

Republic's relevant history following its independence, including its reservation of all islands; (2) the history of the conveyances to O'Brian and Chambers; and (3) the underlying merits of West Gulf and GLO's arguments regarding ownership of the lots. As noted, a review of the claims merits is sometimes necessary at the jurisdictional stage. *See Chambers-Liberty Ctys. Navigation Dist.*, 575 S.W.3d at 349–50; *Miranda*, 133 S.W.3d at 228; *State v. Lueck*, 290 S.W.3d 876, 880 (Tex. 2009) ("[W]hen the facts underlying the merits and subject-matter jurisdiction are intertwined, the State may assert sovereign immunity from suit by a plea to the jurisdiction, even when the trial court must consider evidence necessary to resolve the jurisdictional issues raised." (citation and internal quotation marks omitted)); *Blue*, 34 S.W.3d at 555 ("[A] court deciding a plea to the jurisdiction is not required to look solely to the pleadings but may consider evidence and must do so when necessary to resolve the jurisdictional issues raised."); *see also Lain*, 349 S.W.2d at 582 ("[W]hen officials of the state are the only defendants . . . and they file a plea to the jurisdiction based on sovereign immunity, it is the duty of the court to hear evidence on the issue of title and right of possession and to delay action on the plea until the evidence is in.").

## 1. THE REPUBLIC'S RESERVATION OF ALL THE ISLANDS

We begin with West Gulf's argument that the Republic's reservation of all the islands in 1836 mandates that the title in the land subsequently submerged by water on Galveston Island did not revert to the State.

In 1836, Texas declared its independence from Mexico on March 2 and ratified its first constitution on March 17. 1836–1837 Repub. Tex. Laws 3 (declaration of independence), 9 (constitution), *reprinted in* 1 GAMMEL, THE LAWS OF TEXAS 1822–1897, at 1063, 1136 (Austin, Gammel Book Co. 1898); *Bush*, 601 S.W.3d at 647. On December 10, 1836, the Legislature of the Republic passed a law,

signed by President Sam Houston, stating, "That all islands belonging to this republic shall be, and are hereby reserved for the government use, except the president be authorized specially by congress to sell them." Joint resolution approved Dec. 10, 1836, § 3, 1st Cong., 1st S., 1836–1837 Repub. Tex. Laws 76, 76, *reprinted in* 1 GAMMEL, THE LAWS OF TEXAS 1822–1897, at 1136, 1139 (Austin, Gammel Book Co. 1898).

West Gulf argues that this joint resolution meant that Galveston Island "was severed from the public domain." In support, West Gulf cites to *State v. Delesdenier* and its language that the islands "could not regain that character [of 'public lands'] except by direct and express terms." 7 Tex. 76, 108 (1851). West Gulf argues that, as a result, "[b]ecause Galveston Island is no longer in the public domain, the Texas General Land Office is required to show that the State of Texas regained the lots at issue, which it has not done." West Gulf's argument is misplaced.

The Texas Supreme Court has since clarified its use of this language in *Delesdenier*:

> It was hardly accurate, we think, to say so broadly [in *Delesdenier*] that the islands were "severed from the public domain," and that they "lost the character of public lands." This is true, we think, only in the sense and to the extent intended by the court [in *Delesdenier*] in deciding the question before it, which was whether the lands were open to location by persons holding claims to be satisfied by selection and appropriation out of the public domain generally. The fact that they had been declared to be not subject to such locations was sufficient for that case. The islands certainly continued to be a part of the public domain and to be public lands, but not such public lands as were open for other disposition than that provided for.

*Roberts v. Terrell*, 110 S.W. 733, 734–35 (Tex. 1908) (orig. proceeding). Therefore, contrary to West Gulf's argument, the islands of Texas did not lose their character as public lands owned by the State and the Republic did not divest itself of title to

11

the submerged lands. We reject West Gulf's argument that it owns the submerged lands as a result of the Republic's severance of the islands from the public domain. *See id.*

## 2. *MENARD* & REFERENCE TO ACREAGE

Next, West Gulf argues that the conveyance to O'Brian and Chambers meets a purported "test" articulated by the Texas Supreme Court in *City of Galveston v. Menard*, which allegedly establishes that the State conveyed the submerged lands. *See* 23 Tex. 349 (1859). We will address, in conjunction with this argument, West Gulf's argument that a reference to a specific number of acres in the grants to O'Brian and Chambers indicated an intent to convey title to the now submerged land.

### a. *CITY OF GALVESTON V. MENARD*

By an act of Congress, the Republic of Texas conveyed to Michael B. Menard "one league and one labor of land, lying and situate[d] on, and including the east end of Galveston Island." Act approved Dec. 9, 1836, § 1, 1st Cong., 1st S., 1836–1837 Repub. Tex. Laws 70, 70, *reprinted in* 1 GAMMEL, THE LAWS OF TEXAS 1822–1897, at 1180, 1180 (Austin, Gammel Book Co. 1898); *see Menard* at 394; *see Lain*, 349 S.W.2d at 583. The Texas Supreme Court noted that if the Act was "viewed as an ordinary grant, [it] would not include the [submerged land] lying south of the channel of the bay." *Menard*, 23 Tex. at 394. However, the supreme court concluded that the legislative grant there was intended by the contracting parties to include submerged land known as "the flats." *Id.* at 397. In explaining its conclusion, the supreme court stated:

> In view of the full force of this rule of construction, we are satisfied, that this legislative grant was intended by the contracting parties to include the flats, so as to build a city upon Galveston island, with streets

12

and lots running up to, and bordering on the channel of the bay. This conclusion is arrived at, from considering the object of the grant, its locality, and the acts of the contracting parties in relation to it. This was not an ordinary sale, or donation of land, as upon certificate or scrip, for indefinite purposes; but it was a specific grant, directly made by the government, for a specific object; and it must be understood and construed, with reference to such object. In the same act which made the grant, a part of the east end of the island, including the fort, was reserved; "also one block of lots in a suitable part of the town, for a custom-house, and other public uses, to be selected by an agent, to be appointed by the president for that purpose; to be selected on or before the first day of public sale of lots at that place." The act also stipulated for the payment of fifty thousand dollars for the league and labor, thus granted to Menard. The president was required to make a title in the name of the republic, upon the payment of the money.

*Id.* (internal citations omitted).

The supreme court elaborated that there were provisions in the Act which "unquestionably" showed "that negotiations transpired between the government and Menard, for the building of a town upon the island of Galveston, which would be a port of entry; and that the subject was practically surveyed, and well considered by them." *Id.* at 397–98. Specifically, the supreme court pointed to provisions in the act which reserved part of the east end of the island, including a fort, for a custom house and other public uses, and required the president of the Republic to "make a title in the name of the [R]epublic" upon payment of money by Menard. *Id.* at 397. Based on this and other extrinsic evidence which confirmed the parties' objective of building a town on Galveston Island, the supreme court concluded that the Republic intended to convey and did convey title to the submerged land at issue. *See id.* at 397–405. ("By the strict letter of the legislative grant, Menard's right of property did not extend to the channel [in the bay]. It is extended there, only by resort to the plain intention of the contracting parties."); *see Lain*, 349 S.W.2d at 583; *see also United States v. 1,078.27 Acres of Land, More or Less, Situated in Galveston Cnty., Tex.*,

13

446 F.2d 1030, 1036 (5th Cir. 1971) (analyzing *Menard* and stating "[t]hus where the instrument itself does not fully disclose the intention of the legislature, a court may consider extrinsic facts such as history, subject matter involved, and the end sought to be obtained").

West Gulf argues that the following language in *Menard* established "a test" to determine whether the State conveyed submerged lands: "This was not an ordinary sale, or donation of land, as upon certificate or scrip, for indefinite purposes; but it was a specific grant, directly made by the government, for a specific object; and it must be understood and construed, with reference to such object." *See Menard*, 23 Tex. at 397. As a result, West Gulf argues, the conveyance here included the submerged land because: it was a specific grant because it contained grants of acreage; it had a specific objective, which was to pay the debts of the republic; and it was not an ordinary grant because it was specifically authorized by the Legislature.

We disagree with West Gulf's characterization. First, the language in *Menard* was a summary of the specifics of that case which supported the Court's conclusion that the grant in question conveyed submerged lands. *See TH Invs.*, 218 S.W.3d at 186 ("But, based on the object of the grant, its location, and the acts of the contracting parties, the Court determined that the Legislature intended to convey the submerged flats to Menard, specifically to encourage the construction of a port of entry for commercial activities and promote the building of a city on Galveston Island."); *see also Lain*, 349 S.W.2d at 783 ("The power and intent of the Republic to grant the submerged area included in the patent to Menard in derogation of public rights of navigation, etc., was fully considered. The court confirmed the existence of both power and intent and recognized the absolute right of Menard and his grantees to fill up and use the submerged areas . . . ."). Second, we believe the Court's opinion in *Menard* directs us to look at the language of the relevant act of the Republic's

14

Legislature and any relevant extrinsic evidence in relation to the objective of the grant.

Whether the relevant acts of the Legislature of the Republic conveyed title to the portions of lots 30 and 31 subsequently submerged in the bay is a question of first impression.

### b. THE REPUBLIC'S JOINT RESOLUTION & ACT AUTHORIZING THE TRANSFER AND SALE OF LOTS 30 AND 31

Congress authorized the transfer and sale of the lots in question to O'Brian and Chambers. As to Chambers and lot 30, the joint resolution states:

JOINT RESOLUTION

Concerning Major General Thomas Jefferson Chambers

> Resolved by the Senate and House of Representatives of the republic of Texas, in Congress assembled, That the thanks of congress be tendered to General Chambers for the zeal and ability with which he has defended and sustained the cause of Texas, and the efficient manner in which he has discharged the duties imposed upon him by his commission, in sending to her aid men, arms and supplies by a sacrifice of his private fortune.
>
> 2nd. Resolved, That the auditorial department be authorised [sic] and required to settle with Major General Thmas [sic] Jefferson Chambers and that the president be authorised [sic] to render justice in the fullest manner in all matters and things touching the commission conferred upon him by the provisional government of Texas and his operations under that commission.

Joint resolution approved June 12, 1837, 1st Cong., 2d S., 1836–1837 Repub. Tex. Laws 268, 268–69 (1838), *reprinted in* 1 GAMMEL, THE LAWS OF TEXAS 1822–1897, at 1328–29 (Austin, Gammel Book Co. 1898).

As to O'Brian and lot 31, the Act states:

15

# AN ACT

To Dispose of Galveston and other Islands of the Republic of Texas.

Be it enacted by the Senate and House of Representatives of the republic of Texas, in Congress assembled, That the secretary of the treasury be, and he is hereby authorized and required to cause the Island of Galveston except the league and labor sold to M. B. Menard and associates, and all other Islands within this republic to be surveyed in lots not less than ten nor exceeding forty acres each, and that he cause the same to be sold at auction to the highest bidder, on the second Monday of November next at the state house in the city of Houston, the proceeds of the sale to be paid in specie or the notes of current and specie paying banks, in the following manner, to wit: one fourth part thereof to be paid down, and the other three-fourth to be in three equal instalments of three, six and nine months.

SEC. 2. Be it further enacted, That all persons, aliens not excepted, shall have the privilege of purchasing and holding the same, and the president is authorized to issue patents to them accordingly.

SEC. 3. Be it further enacted, That the proceeds of the sales of all such Islands as may be sold by virtue of this act, shall be applied as follows, to wit: one half to be applied to the purchase of arms, munitions of war, clothing and pay for the army, one fourth for the navy, and one fourth shall be paid into the treasury of the republic to be paid out only for the redemption of the promissory notes of the government contemplated to be issued by a law previously passed by this congress.

SEC. 4. Be it further enacted, That the the [sic] secretary of the treasury shall cause the aforesaid sale to be published for three months previous to the day of sale in New Orleans, Mobile, Charleston, Baltimore, Philadelphia, New York, Boston, Nashville and Louisvill, Ky., [sic] papers.

SEC. 5. Be it further enacted, That the secretary of the treasury be authorized to pay the expenses of surveying, advertising and sale, out of the first money from the sales aforesaid.

SEC. 6. Be it further enacted, That if any persons who shall purchase any of the aforesaid lots or lands, shall fail to make payment of the several instalments in conformity with this act, he or they shall forfeit all such sums as they may have previously paid, and the lots and lands purchased by such defaulter shall revert to the government of this

republic.

Act approved June 12, 1837, 1st Cong., 2d S., 1836–1837, 267 (1838), *reprinted in* 1 GAMMEL, THE LAWS OF TEXAS 1822–1897, at 1327–28.

Both the joint resolution and the act lack plain and positive language regarding any submerged land. *See Lorino*, 175 S.W.3d at 413 ("The rule is firmly established in this State that land under navigable waters is withdrawn from the general provision of the statutes conferring upon the Land Commissioner the right to contract for the sale or lease thereof, and passes by grant or sale only when so expressly provided by the sovereign authority; and there is no presumption that the State has authorized such grant or sale."); *Bradford*, 50 S.W.2d at 1075 ("[B]efore a statute will be construed to include land under navigable waters, . . . it will have to be expressed in plain and positive language and not in general language.").

Furthermore, there are no sections in the joint resolution or act indicating that the Republic intended to transfer title to any submerged lands. *Cf. Menard*, 23 Tex. at 397–98 (noting sections in the act which indicated there was an objective of building a town on Galveston Island and that negotiations transpired between the government and Menard for the building of that town). Unlike the objective in the grant to Menard to build a new city in an undeveloped area of an island's coast, the objective of the grant to Chambers was to reward him for his service during the war and the objective of the grant to O'Brian was to raise money for numerous causes. We cannot conclude that the objective of the grants to Chambers and O'Brian implicitly or explicitly necessitate access or title to any submerged land, unlike the grant to Menard. *Cf. id.* ("The rule of the civil law, made the shore extend to the line of the highest tide of the winter; and if that be adopted in interpreting the grant, it forced out Menard's right to erect a town, one thousand feet from the channel, and left unappropriated the whole of the intervening space, upon which no one could

17

erect, with any security to himself, any warehouse, wharf, or other building, which were then, as well as now, so necessary to build up the city, and facilitate its commerce."). Likewise, West Gulf has not pointed us to any extrinsic evidence of actions by the Republic, Chambers, or O'Brian indicating that the objective of the grants—to pay the Republic's debts and reward Chambers for his efforts during the war of independence—necessitated title and access to the submerged lands, unlike the construction of the city in *Menard*. *Cf. id.*

### c.  THE REPUBLIC'S PATENTS CONVEYING LOTS 30 AND 31

West Gulf argues that a reference to a specific number of acres in the patents conveying the lots indicates that the State intended to transfer title to any submerged lands. We are not persuaded by this argument.

Here, the patent conveying lot 30 to Chambers provided that the lot was 13.50 acres, and the patent conveying lot 31 to O'Brian provided that the lot was 13.85 acres. However, a reference to a specific number of acreage in the patents, standing alone, does not support a conclusion that the relevant acts established the State's intent to convey its title to any subsequently submerged lands. *See Lorino*, 175 S.W.2d at 413; *Heard v. Town of Refugio*, 103 S.W.2d 728, 732 (Tex. 1937) ("[I]t is well settled that a more certain and specific intention on the part of the government must appear to divest itself of title to land under water than is required for the passing of land not so covered."); *Bradford*, 50 S.W.2d at 170 ("No power under the law is given [to] the surveyor or the land commissioner to grant soil under navigable waters, and no subsequent recognition or confirmation by the land commissioner of a survey made to pass soil under such waters will be presumed."); *Tex. Gen. Land Office v. Porretto*, 369 S.W.3d 276, 284, (Tex. App.—Houston [1st Dist.] 2011) ("We have a longstanding duty to strictly construe legislative grants of property in favor of the State, preserving for the State any interest that is not conveyed in

18

unequivocal and explicit terms."), *aff'd in part and rev'd in part on other grounds*, 448 S.W.3d 393 (Tex. 2014); *see also Bradford*, 50 S.W.2d at 1075 (noting that "all grants with respect to lands under navigable waters, such as river beds and channels, are strictly construed against the grantee; that, if there is any ambiguity in the act, it will be construed in favor of the state, and, unless the act contains plain and unmistakable language expressly conveying the land under river beds and channels, it will not be construed to include them"); *1,072.27 Acres of Land*, 446 F.2d at 1038 ("This is entirely consistent with the reasoning of the Supreme Court of Texas in *Menard*. The intent of the Congress, not the words of the officer who prepared the patent for signature by the president, is controlling.").

Furthermore, to the extent the original area described in the patents included submerged land, if any, the title to those submerged lands was also not conveyed due to the absence of legislative authorization.[10] *See Bush*, 601 S.W.3d at 643–44, 648.

### 3. THE STATE OWNS THE SUBMERGED PORTIONS OF LOT 30 & 31

We conclude that the Republic did not divest itself of title to any submerged lands in lots 30 and 31 through the relevant legislative joint resolution and act authorizing the sale of lots 30 and 31. *Cf. Menard*, 23 Tex. 397–405; *see Bradford*, 50 S.W.2d at 1075 ("[T]he courts of this state have consistently held that all grants with respect to lands under navigable waters, such as river beds and channels, are

---

[10] In such an event, however, the Legislature has the authority to "validate the titles to the land for which patents and awards have been issued." *See Bush v. Lone Oak Club, LLC*, 601 S.W.3d 639, 648 (Tex. 2020) (quoting *State v. Bradford*, 50 S.W.2d 1065, 1069, 1077 (Tex. 1932)); *see also Roberts v. Terrell*, 110 S.W. 733, 734 (Tex. 1908) (orig. proceeding) ("It was therefore found unnecessary for this court in *Franklin v. Tiernan*[, 56 Tex. 618 (Tex. 1882),] to decide the question whether or not the language quoted from the act of 1870 authorized the appropriation of lands upon islands by claimants of homestead donations; the claim in question in that case having been validated by the act of 1871.").

19

strictly construed against the grantee; that, if there is any ambiguity in the act, it will be construed in favor of the state; and, unless the act contains plain and unmistakable language expressly conveying the land under river beds and channels, it will not be construed to include them."); *TH Invs.*, 218 S.W.3d at 186 ("Property conveyed by the State to an individual can remain privately owned even if it is submerged under tide waters—but only under very special circumstances in which the State manifested its intent that the private landowner continue to own the property even if submerged."). As a result, we conclude that the State owns the submerged portion of lots 30 and 31. *See Severance*, 370 S.W.3d at 718 ("When beachfront property recedes seaward and becomes part of the wet beach or submerged under the ocean, a private owner loses that property to the public trust.").

We reject appellant's arguments that it raised a fact issue as to whether it owns the submerged lands and overrule its first issue. Because we conclude appellant does not own the submerged lands, appellees did not act ultra vires, and the trial court did not err when it granted appellees' plea to the jurisdiction. Therefore, we need not address appellant's second and third issues. *See* Tex. R. App. P. 47.1.

## III.  CONCLUSION

We affirm the trial court's order dismissing for want of jurisdiction with prejudice West Gulf's claim for trespass to try title as to the submerged portions of the lots and its takings claim in its entirety.


/s/      Margaret "Meg" Poissant
Justice

Panel consists of Justices Spain, Hassan, and Poissant.

20